UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

—————

EDMUND HERNDON, #491050,     )
       )
      Petitioner,     )     Case No. 1:07-cv-285
       )
v.      )     Honorable Robert Holmes Bell
       )
THOMAS K. BELL,     )
       )     **REPORT AND RECOMMENDATION**
      Respondent.     )
_____)

This is a habeas corpus proceeding brought by a state prisoner pursuant to 28 U.S.C.

§ 2254. Petitioner is serving a prison sentence of 16-to-30 years, imposed by the Wexford County

Circuit Court on May 10, 2004, after a jury found petitioner guilty of the second-degree murder of

his wife. MICH. COMP. LAWS § 750.317. At the request of retained appellate counsel, the circuit

court conducted a lengthy evidentiary hearing on petitioner's motion for a new trial, based on the

alleged ineffectiveness of petitioner's trial counsel. On March 15, 2005, Circuit Judge Charles D.

Corwin issued a thorough written opinion analyzing and rejecting all claims of ineffective assistance

of counsel. Petitioner thereafter appealed as of right to the Michigan Court of Appeals, which

rejected all appellate claims and affirmed the conviction and sentence. The Michigan Supreme Court

denied leave to appeal on May 30, 2006.

In his timely *pro se* habeas corpus petition, petitioner raises four claims for relief.

First, he alleges violation of his Sixth Amendment right to the effective assistance of counsel arising

from numerous deficiencies of trial counsel, including failure to investigate the case, failure to hire

a ballistics expert, failure to make an opening statement or call witnesses, and prejudicial waiver of petitioner's right to a preliminary examination. Second, petitioner alleges trial court error in denying his post-judgment motion for "appellate discovery" allowing forensic examination of the shotgun used to kill his wife. Third, he asserts that the evidence was insufficient to support the jury's verdict of second-degree murder. Finally, petitioner claims sentencing error arising from judicial fact-finding in violation of his Sixth Amendment rights as enunciated in *Blakely v. Washington*, 542 U.S. 296 (2004).

District Judge Robert Holmes Bell has referred this matter to me for review of the record and issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 10 of the Rules Governing Section 2254 Proceedings in the District Courts. After review of the state-court record and the submissions of the parties, I conclude that petitioner's habeas corpus claims are devoid of merit and recommend that the petition be denied.

## **Proposed Findings of Fact**

### 1. **Pretrial Proceedings**

The state-court prosecution arose from the shooting death of Ruth Herndon on August 18, 2003, in Mesick, Michigan. On the afternoon of August 18, the Wexford County 911 dispatcher received a call from petitioner, who reported that he had just shot and killed his wife. Petitioner hung up, but the dispatcher called back and kept him on the phone until officers arrived. Officers arrived on the scene and found Mrs. Herndon on the floor with a shotgun wound to the right side of her head. They also found a shotgun on a table near the victim. Petitioner was taken into custody. He informed the officers that he and the victim had argued about replacing bathroom fixtures. He

decided to get the shotgun and commit suicide. The shotgun barrel was too long for him to shoot himself, so he took the gun to his wife and asked her to kill him. The victim called petitioner "stupid" and warned him not to threaten her. Mrs. Herndon threatened to call the police. Petitioner admitted that he aimed the shotgun at his wife's head but insisted that he did not remember pulling the trigger. This course of events led to the filing of a complaint against petitioner charging him with open murder.[1]

Petitioner retained attorney Burton Hines, Jr. to represent him. At that time, Mr. Hines had been in practice for approximately thirty years. From 1977 through 1981, he had served as the elected prosecutor for Wexford County, Michigan. After 1981, he was in private practice and had handled an estimated 1,000 felony cases, including approximately ten murder cases. (*Ginther* Hearing (GH), 8-9, docket # 10).

The matter was set for a preliminary examination in the state district court on October 3, 2003. On the advice of defense counsel, petitioner waived the preliminary examination. This was done pursuant to an agreement between the prosecutor and defense counsel that the Criminal Information would be amended to include alternative charges of open murder and manslaughter, thus ensuring that the lesser offense of manslaughter would be available to petitioner at the time of trial. (GH, 17-21).

---

[1] Under Michigan law, the charge of open murder allows a defendant to be convicted of either first-degree or second-degree murder, depending on the proofs. MICH. COMP. LAWS § 767.71; *see People v. Johnson*, 398 N.W.2d 219, 222-23 (Mich. 1986); *see also Williams v. Jones*, 231 F. Supp. 2d 586, 589 (E.D. Mich. 2002).

## 2.    Jury Trial

Jury trial commenced before Circuit Judge Charles D. Corwin on March 9, 2004. (TT I).[2] The prosecution's first witness was Detective Lieutenant Daniel O'Riley of the Wexford County Sheriff's Department. (TT II, 175). Through the testimony of Lt. O'Riley, the prosecution introduced into evidence the tape-recording of the 911 call received by Wexford County Central Dispatch on August 18, 2003, from petitioner. (PX 1). Also introduced without objection was a transcript of the original 911 call, as well as a follow-up call placed immediately thereafter by the emergency dispatcher to petitioner. (PX 2). (A copy of the transcript is attached to the petition (docket # 1).) The 911 tapes were played for the jury, and copies of the transcript were published to them. (TT II, 175-80).

The transcript of the first 911 call (PX 2) shows that petitioner called Wexford County Central Dispatch at approximately 2:08 in the afternoon. Petitioner's first statement to the dispatcher was, "Yes, I just killed my wife." Petitioner said he "[j]ust shot her," and then volunteered, "She and I've been going at it and I just, I couldn't take any more." The dispatcher began to ask basic information, such as petitioner's name and address. When the dispatcher asked for petitioner's wife's name, he answered, "Ruth . . . She was threatening to call you. With that . . . We got in a fight." The dispatcher asked where the victim had been shot, and petitioner answered, "I just shot her in the head," then volunteering that he used a .410 caliber shotgun.

Petitioner volunteered that he wanted to shoot himself too, "probably." The dispatcher told him not to shoot himself. Petitioner said that he wanted to shoot himself because he did not want to go to jail. The dispatcher tried to calm petitioner down and then dispatched police

---

[2] The trial transcript (TT) is reflected in this court's record as docket #'s 16, 17, and 18.

to the scene. The dispatcher asked petitioner to stay on the line, but petitioner continued to say that he did not want to go to jail and he wanted to shoot himself. The dispatcher repeated that petitioner should not kill himself and that he should let the officers get there to help him. Petitioner then hung up.

The prosecutor interrupted the testimony of Lt. O'Riley, without objection, to present testimony from Amy Howe Al-Armanazi, petitioner's daughter. (TT II, 181-82). Ms. Al-Armanazi testified that the victim was her mother and that petitioner was her adoptive father. On August 18, 2003, she received a telephone message from petitioner, which was admitted as Peoples Exhibit 3 without objection. (TT II, 183-85). In that message, petitioner said that he had just "shot your mother."

The next prosecution witness was Gerald Leavell, a patrol sergeant for the Wexford County Sheriff's Department. (TT II, 190). Sgt. Leavell was dispatched to petitioner's home on August 18, 2003, arriving at 2:20 in the afternoon. (*Id.*, 191). As he approached the house, petitioner came out. The officer instructed him to place his hands in the air. Petitioner complied, and the sergeant could see that petitioner had no weapon. (*Id.*, 192-93). After placing petitioner in the patrol car, the officer entered the house and observed a small gauge shotgun on a kitchen or dining room table. (*Id.,* 193). He also observed Mrs. Herndon lying on the floor to the right of the entranceway. He determined that she was dead. He observed some trauma to the right side of her head and a large pool of blood. (*Id.*, 194). The prosecution admitted several photographs of the scene to the testimony of Sgt. Leavell. (*Id.*, 196-200).

Lt. O'Riley was recalled to the stand for purposes of authenticating the tape and transcript of the second 911 conversation, which was also published to the jury. (TT II, 202-04) (The

transcript is attached to the habeas petition.) That tape and transcript showed that at approximately 2:15 p.m., a different dispatcher called petitioner. Other officers were also on the line. The dispatcher asked whether petitioner was okay. Petitioner answered that he was okay and then said that he was not okay either. Petitioner volunteered that he had tried to call his daughter but that she was not at home and that he had left a message on her answering machine, telling her what had happened. Petitioner said that he didn't care and that he was "going to hell, that's for sure." The dispatcher tried to keep him on the line and told him that officers could be there in a few minutes to help him and his wife. Petitioner said, "They can't do anything for her, she's dead." The dispatcher asked what kind of gun petitioner used, and he again identified the weapon as a .410. The dispatcher asked where the victim was, and petitioner said, "She was standing by the phone and I shot her in the head." The dispatcher asked where the gun was, and petitioner said that it was on the table. The dispatcher told him not to touch it and to just stay on the line. The dispatcher then asked for information about petitioner's daughter, who lived in Grand Blanc.

After some further conversation, petitioner volunteered that he and his wife were doing a lot of remodeling work on the house and that he was having trouble with the plumbing. Petitioner said that that's what started the whole thing. At one point, petitioner apparently began to lose his composure, and the dispatcher struggled to keep him talking. Petitioner said, "I done it . . ., I don't know why. I just can't take the badgering like that . . . ." He then began again to threaten to shoot himself.

As the dispatcher was trying to get petitioner to relax, he volunteered that his wife had called him "stupid." "I'm not stupid, I just lost my temper . . . I've got a hell of a temper. I let it kill me this time and then I let it kill her; [o]h, God." Petitioner volunteered, "I done something

terrible.  Terrible, terrible, terrible, and I'll probably die for it.  Why doesn't God take me?  . . . [.]

I've had heart problems[.] . . ."  Petitioner then said that the patrol cars had arrived.  Officers took

petitioner into custody without incident.

The prosecution interrupted the testimony of Lt. Hines for a second time to present

the testimony of Officer Randy Powell, who responded to the scene at about the same time as Sgt.

Leavell.  (TT II, 206).  After Leavell placed petitioner under arrest, Powell walked petitioner to the

patrol car and stayed with him, but did not interrogate him.  (*Id.*, 207).  While they were in the

driveway, a car pulled up carrying an "elderly lady."  Petitioner informed the officer that the lady was

Marie, the victim's mother.  Petitioner told the officer that he wanted him to "go and tell her that he

shot Ruth."  The officer turned petitioner over to Detective Webster and ultimately entered the crime

scene, where he retrieved the shotgun.  (*Id.*, 210-16).  The testimony of the next prosecution witness,

Officer Kevin Joseph Kovach, was cumulative to the testimony of the other officers.

The prosecutor recalled Lt. O'Riley, who was the principal officer to interview

petitioner.  After Sgt. Greg Webster gave petitioner his *Miranda* rights at the scene, petitioner agreed

to speak with O'Riley.  (TT II, 254).  Petitioner told O'Riley that everything had been going wrong

that day.  He had been doing some plumbing in connection with remodeling the house that did not

work out and had accidentally put a hole in the drywall.  He was having trouble finding the proper

plumbing parts, and needed to find receipts so that the incorrect parts could be returned to the

hardware store.  (TT II, 254-55).  Ultimately, an argument started about the receipts, during which

Mrs. Herndon called petitioner "stupid."  (*Id.*, 256).  His response was to say, "Well, I'm going to

go upstairs and get the gun and shoot myself."  He retrieved the .410 caliber shotgun from a closet

upstairs.  While he was there, he tried to get the gun into a position to shoot himself but was unable

to do it.  He then went back downstairs and again tried to get the gun in a position to shoot himself.

Mrs. Herndon was threatening to call 911 because petitioner had the gun out.  "At that point, he says

he moves the gun around and he just shot her.  He doesn't remember doing it, but he knows he did

it."  (*Id.*, 256).  After he shot his wife, petitioner called 911 and told the police what he had done.

He then hung up and called his daughter, leaving a message on her answering machine.  The

Sheriff's Department called him back and talked to him until the police arrived.  (*Id.*, 257).

O'Riley interviewed petitioner a second time at the office of the Sheriff's Department.

(TT II, 265-66).  The interview, including a second set of *Miranda* warnings, was taped.  (*Id.*, 266).

The transcript of the tape was received in evidence as People's Exhibit 41, without objection.  (*Id.*,

267-68).  The tape and a transcript of the interview were published to the jury.  (A copy of the

transcript of interview (dated 8/18/2003 at 14:08) is attached to the petition).  In his *Mirandized*

statement to O'Riley, petitioner recounted the discussions concerning home remodeling that led up

to the argument between him and Ruth.  He went upstairs to get the .410 shotgun.  "I had it on my

mind to go up and get the gun and shoot myself."  (p. 7).  He was unsuccessful and brought the gun

downstairs.  Ruth said, "You're stupid." or words to that effect.  This "just made me blow it."  "I

guess I just held the gun up and fired it.  I don't know."  (p. 8).  He said he did not plan to kill her.

"I guess my temper just got with me and I just blew."  (p. 10).  On cross-examination, defense

counsel was successful in establishing that petitioner informed O'Riley during their first interview

that petitioner had tried to shoot himself upstairs but could not get the shotgun into position and that

he tried again to kill himself in his wife's presence downstairs.  O'Riley also confirmed that just

before Mrs. Herndon was shot, she had called petitioner "stupid."  (TT II, 271-72).

On the third day of trial, the prosecution's first witness was Dr. Joyce DeJonge, who had conducted the autopsy of Ruth Herndon. (TT III, 286). Dr. DeJonge was the Medical Director of Forensic Pathology at Sparrow Hospital in Lansing. (*Id.*). Dr. DeJonge stated that the cause of death was extensive damage to the brain and skull, caused by a shotgun wound to the right side of Ruth Herndon's head. (*Id.*, 293-94). The doctor's forensic examination led her to conclude that the shotgun was eighteen to thirty inches away from the victim's head when it was discharged. (TT III, 293-94; 305-09). Dr. DeJonge supported this estimate by explaining to the jury the nature of a shotgun's projectiles. She stated that the shotgun pellets were like "BBs" that leave the muzzle together. If the body is close to the end of the muzzle, "You're going to get one single hole." (TT III, 306). The further away the muzzle is from the body, the more the pellets spread out. (*Id.*). Therefore, if the muzzle is further away, "instead of having a nice round circular hole, you're going to get irregular margins, because the pellets are starting to kind of spread apart a little bit the farther away you get." (*Id.*, 307). Furthermore, if the muzzle is close enough, gunpowder stippling will cause a small abrasion to the skin. Finally, a close shot will feature fragments of plastic wadding from the shotgun shell found in the wound. If the shot is further away, the plastic will fall away. (*Id.*). Dr. DeJonge explained that in this particular case, the wound showed irregular margins, the plastic shot cup was found inside the body, and powder stippling was found near the wound. (*Id.*, 308). Dr. DeJonge indicated that she would defer to a firearms expert, but that in her opinion, stippling of this kind may be found when the range between the muzzle and the victim is from six to thirty inches. Therefore, the doctor could conclude that the shotgun was not in close contact with the victim's head but was, in her estimation, eighteen to thirty inches away. (*Id.*, 308-09). Dr.

DeJonge testified that the victim would have died instantly from the traumatic injury to her brain. (TT III, 309-10). Defense counsel did not cross-examine Dr. DeJonge.

After the People rested, defense attorney Hines presented a motion outside the presence of the jury for a directed verdict of acquittal on the charges of first-degree and second-degree murder. Mr. Hines argued that, although there was no doubt that petitioner caused his wife's death, the prosecution presented no evidence that petitioner intended to kill or that any intent was premeditated. (TT III, 311-12). The prosecutor argued that premeditation and deliberation sufficient for first-degree murder were satisfied by circumstantial evidence, including the length of time it took petitioner to go upstairs, get the gun, return downstairs, and shoot his wife. (*Id.*, 313). The court found that a reasonable jury could find the necessary elements of intent to kill and premeditation sufficient for first-degree murder, especially in light of the fact that petitioner got the gun from the bedroom, threatened the victim when she tried to call 911, and shot her from eighteen to thirty inches away. Because the evidence was sufficient to support a verdict of guilty on first-degree murder, the court found that second-degree murder, a lesser-included offense, was necessarily supported as well. (*Id.*, 316).

Defense counsel then informed the court that he intended to waive his opening statement and rest without presenting any witnesses. He informed the court that he had spoken to petitioner 56 times since being retained and that they had numerous opportunities to talk about whether or not petitioner would choose to testify. "And after careful consideration of the pros and cons of our discussions, he has decided not to take the witness stand and submit himself to cross-examination." (TT III, 317). Petitioner volunteered, "That's true." (*Id.*). The jury was called back into the courtroom and informed that defendant was waiving opening statement and chose to rest

without calling witnesses. Approximately one-half hour later, counsel presented their final arguments. (TT III, 318-19).

The prosecutor's final argument principally emphasized petitioner's own statements to officers and the forensic evidence presented by Dr. DeJonge. Defense counsel's argument began with the concession that this was a senseless killing and that Ruth Herndon did not deserve to die. (TT III, 338). Defense counsel emphasized that petitioner was then 70 years old and retired after being employed by the State of Michigan. He and his wife had been married for thirty years. (TT III, 341). Counsel argued that the evidence did not support a finding of first or second-degree murder and that he wanted the jury to "think about manslaughter." (*Id.*, 343). He remarked that the only evidence in the case establishing intent consisted of petitioner's own statements. He argued that petitioner's statements showed that his principal intent was to commit suicide, which he had considered in the past. This explains why he went upstairs to get the gun and, when he could not manage to shoot himself, came downstairs to seek his wife's aid. (*Id.*, 344-45). Counsel emphasized the vagueness of many of petitioner's statements and asked the jury whether petitioner really did know what happened or why he did what he did. "Now here's a man that comes down the stairs and the only evidence you have is from him, he himself, that he was intending to commit suicide, or scare her, or get her attention." (*Id.*, 346). Counsel argued that petitioner's lack of malice was shown by the fact that he called 911 immediately. (*Id.*, 347).

> Is this the criminal mind that you really think we have here? He sits on the floor and waits for the officers to arrive. He's arrested without incident. He cooperates fully with police officers. He doesn't run from the scene, he doesn't hide, he doesn't say he was cleaning his gun and the gun accidentally went off. He freely admits his actions and there's no deception.

(*Id.*, 348).

Counsel argued that the evidence did not support either deliberation or an intent to kill the victim or do great bodily harm. Rather, he was disturbed by emotional excitement to the point where a reasonable person might have acted on impulse without thinking twice. (*Id.*, 348).

Counsel then went through the elements of each of the relevant crimes (first-degree murder, second-degree murder, voluntary manslaughter, involuntary manslaughter, discharge of a firearm intentionally aimed but without malice), commenting on how the evidence supported or did not support each offense. (TT III, 350-57).

After rebuttal, the court instructed the jury on five offenses: first-degree murder, second-degree murder, voluntary manslaughter, involuntary manslaughter, and killing by intentionally aiming a firearm without malice. (TT III, 379-89). After two hours of deliberation, the jury found petitioner guilty of second-degree murder. (*Id.*, 395).

Petitioner appeared before the court on May 10, 2004, for sentencing. (Sentencing Transcript (ST), docket # 19). After hearing allocution from all parties, the court expressed its intention to sentence petitioner within the state sentencing guidelines, imposing a sentence of 16-to-30 years, with credit for time served. On May 10, 2004, the court entered its judgment. (5/10/04 Judgment of Sentence Commitment to Department of Corrections, attached to Michigan Court of Appeals record, docket # 11).

### 3.    Proceedings on Motion for New Trial

On October 4, 2004, petitioner filed post-trial motions. These motions were submitted by retained appellate counsel, Mark A. Satawa. The first was a motion for new trial, arguing ineffective assistance of trial counsel, insufficiency of the evidence, and sentencing error.

The second was a motion to allow post-trial discovery, specifically, a forensic evaluation of the shotgun by a firearms expert to determine whether the discharge may have been accidental.

On January 21, 2005, Judge Charles Corwin conducted a lengthy evidentiary hearing on petitioner's post-trial motions.[3]  Petitioner's counsel called four witnesses at the hearing:  Burton Hines (trial counsel), James Samuels (a lawyer providing expert testimony concerning the standard of practice in criminal defense), Stephen Howard (a firearms expert), and William Herndon (petitioner's brother).  The motion for a new trial asserted that trial counsel was ineffective for a myriad of reasons, including failing to make an opening statement, failure to cross-examine witnesses, failure to retain experts, failure to interview witnesses, failure to move for suppression of petitioner's pretrial statements, and failure to file a motion for bill of particulars "to attempt to both dismiss an unsupportable first-degree murder charge and to reign in the prosecution."  (Motion for new trial dated 10/4/04, attached to habeas petition).

At the *Ginther* hearing, petitioner's counsel called Burton Hines, trial counsel.  Hines had become a member of the Michigan State Bar in 1973 and was in private practice from then until 1977.  He was the elected prosecuting attorney for Wexford County from 1977 until 1981.  He had been in private practice since that time.  (GH, 8).  In his more than thirty years of practice, he estimated that he had handled over a thousand felony cases and as many as ten murder cases, although he had never tried a murder case before this one.  (*Id.*, 9).  Of the ten murder cases he handled, all of them involved representation of the defendant.  (*Id.*).

_____

[3] Under Michigan practice, evidentiary hearings on the question of ineffective assistance of counsel are referred to as "*Ginther* hearings" after *People v. Ginther*, 212 N.W.2d 922 (Mich. 1973). The transcript of the *Ginther* hearing is found in this court's record as docket # 10.

The court had appointed Hines to represent petitioner, but during the first client meeting, Hines realized that petitioner was not indigent and would not qualify for appointed counsel. Petitioner then asked if he could hire Hines and the two agreed upon a fee. Hines thereafter acted as petitioner's retained counsel. (GH, 10-11).

Mr. Hines testified that his theory of the case was to seek to have petitioner found guilty of manslaughter rather than murder. (GH, 15). He thought that it was important to prevent the first-degree murder charge from going to the jury, but did not think it was possible to accomplish this after he had reviewed the evidence, especially petitioner's 911 statements and his confession. (*Id.*, 16). Mr. Satawa examined Hines on each of the contested aspects of his handling of the trial and pretrial proceedings in the criminal case. In summary, Hines testified as follows:

- He did not file a motion for bill of particulars in the case, because he knew what the particulars of the case were, as it was relatively simple on its facts. (GH, 14).

- Hines decided to waive the preliminary examination in exchange for a promise by the prosecutor to amend the felony Information to charge manslaughter as an alternative offense to open murder. Mr. Hines was concerned that the examining magistrate would bind petitioner over only on the open murder charge because of the weak evidence of provocation. He believed that under *People v. Cornell*,[4] the circuit judge might refuse to instruct the jury on manslaughter, unless the prosecutor agreed to such an obstruction. He did not believe that the district judge would have bound the

---

[4] *People v. Cornell*, 646 N.W.2d 127 (Mich. 2002).

case over on manslaughter, given the facts in the case, and therefore concluded that the prosecutor's agreement to amend the felony information to specifically add manslaughter gave him a "tactical advantage" by keeping open the possibility of a manslaughter verdict. "I wasn't happy with the open murder, obviously, but I didn't want that case bound over so as to foreclose the possibility of manslaughter." (GH, 18-20). Although he could have insisted on a preliminary examination, he believed that there was "too much danger of it being bound over only on open murder." (*Id.*, 21). This fear was based on the weakness of the evidence of provocation sufficient to reduce murder to manslaughter: that Ruth's "calling him stupid was not a sufficient provocation." (GH, 23-24; 106-07).

• Mr. Hines believed that he received another tactical advantage arising from the prosecutor's amendment of the information to include manslaughter, because the presence of the alternative charge allowed him to argue to the jury that even the prosecutor was not sure whether the crime was murder or manslaughter. (GH, 71). A further tactical advantage in waiving the preliminary examination was to deprive the prosecutor of the opportunity to rehearse the testimony of his witnesses and to fix any potential problems before trial. (GH, 72).

• Hines testified that he waived opening statement because he did not intend to introduce any evidence. (GH, 61-62, 94). Petitioner collaborated with Hines in coming to the decision that petitioner should not testify at trial.

Petitioner did not feel he could stand up to cross-examination, and he tended to get angry. (GH, 77). Hines decided not to call petitioner's daughter Jennifer Herndon to testify concerning petitioner's mental state because this would open the door to the prosecution's calling of Ruth's other children (Amy and Kelly) as rebuttal witnesses, as they were "adamantly opposed to" petitioner. (GH, 60).

• Hines testified concerning his reasons for not seeking to suppress petitioner's pretrial statements. There was no legal basis to exclude the 911 tapes, which were spontaneous declarations not in response to any police interrogation. Similarly, a motion to suppress petitioner's confessions would not have been meritorious, as petitioner had been properly *Mirandized* and no indicia of involuntariness existed. (GH, 73-75). Hines also perceived a tactical advantage in having the statements admitted: the statements set forth defendant's position that the shooting occurred during a suicide attempt, so Hines was not forced to place petitioner on the stand to establish these facts. This precluded both cross-examination and the danger of rebuttal witnesses on the subject. (GH, 75-77).

• Hines chose not to hire a ballistics expert, because he was comfortable with the pathologist's opinion that the muzzle was relatively close to the victim -- 18-to-30 inches away. (GH, 81-83). The jury was more likely to conclude that the shooting was an accident if petitioner was closer to the victim. If the victim were farther away, it could indicate that the shooter had aimed the

shotgun with intent to hit the victim. (GH, 83-84). In a similar vein, Hines and petitioner carefully discussed the question whether the gun discharged accidentally. Petitioner never told Hines that the shooting was an accident, and Hines concluded that there was no evidence to support a theory based on accidental discharge of the firearm. Hines concluded that he could not argue accidental discharge, because of petitioner's statements on the 911 tape. (GH, 87).

Appellate counsel called James Samuels, a criminal defense lawyer, over the prosecutor's objection. (GH, 125). Mr. Samuels, who had handled cases both for the prosecution and the defense, testified concerning the standard of practice in criminal cases. In general, he opined that Mr. Hines had failed to subject the prosecution's case to "meaningful adversarial testing." (GH, 128). Samuels criticized defense counsel's performance from *voir dire* through final argument. Samuels testified, for example, that Hines should have attempted to interrupt the flow of the prosecutor's case with objections. (GH, 132). He testified that Hines should have waived neither the preliminary examination nor opening statement. (GH, 134). He criticized Hines for failing to hire a ballistics expert and for failing to articulate his theory of the case until closing argument. (GH, 142-46). Samuels also faulted Hines for failing to arrange for a private polygraph examination of his client. (GH, 147-48).

Petitioner called Stephen Howard, a firearms expert. Howard presented a report dated June 20, 2004 (appended to the habeas corpus petition). His report was addressed to questions such as the distance between the victim and the firearm and the issue of accidental discharge. Because Howard did not have access to the .410 caliber shotgun involved in the shooting, his conclusions

were tentative and highly conditional. Using a similar firearm, Howard determined that the muzzle was further away from the deceased than was reported by Dr. DeJonge. He concluded that petitioner was sitting, kneeling, or rising between six and six-and-a-half feet away from the victim when the firearm discharged. With regard to whether the shooting was accidental, Howard stated that he could not answer the question because he had not been allowed to inspect the firearm. Howard, who is an attorney, further opined that Hines violated his duty as petitioner's attorney in failing to have the murder weapon inspected by an expert.

On March 15, 2005, Circuit Judge Charles D. Corwin issued a ten-page opinion thoroughly analyzing each of the claims of ineffective assistance of counsel. The court expressly cited and applied the two-part test articulated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). In general, the court found that petitioner failed to meet his burden of proof with regard to either of the two prongs of the *Strickland* test. Judge Corwin remarked that many, if not all, of petitioner's arguments were made with the benefit of hindsight and were not measured against an objective standard of reasonableness. (Op., 4). The court further remarked that trial counsel cannot be required to make meritless objections, advocate meritless positions, or present defenses not supported by the facts. (*Id.*). The court rejected the contention that defense counsel should have pursued a defense based on the accidental discharge of the gun, remarking that petitioner never told his counsel that the gun discharged accidentally and that the sequence of events that petitioner described to his attorney did not support a finding of accident. "Trial counsel is not required to fabricate defenses which are unsupported by the facts and/or by what his client tells him or her." (*Id.*, 5). The tactic that defense attorney Hines did adopt was to argue provocation, with no premeditation or deliberation. Although the provocation argument was

-18-

"admittedly thin," the court remarked that "there was little else for trial counsel to argue considering what his client had consistently told him and defendant's admissions to the 911 dispatcher, to the police, and to his daughter on her answering machine." (*Id.*). The court found that there was no viable basis upon which defense counsel could have argued for suppression of any of petitioner's statements. (*Id.*).

Judge Corwin found as a fact that defense counsel made every critical trial strategy decision "in consultation with the defendant and defendant's brother, who apparently was acting as an advisor to the defendant at defendant's request." (Op., 5). Turning to the claim that counsel failed to investigate defenses involving the condition of the shotgun and should have called a ballistics expert, the court found that "a ballistics expert would not have been of critical assistance to the defendant." (*Id.*, 6). The court remarked that the ballistics expert would have contradicted the testimony of the pathologist, because the ballistics expert concluded that the gun was much further away from the victim when it was discharged. "[T]his could be considered a strong evidence supporting the prosecutor's theory of intent to kill because it is highly unlikely that an accidentally discharged shotgun from several feet away would have hit the victim directly between her ear and her eye on a straight line." (*Id.*). The court further found that the presence of gunpowder stippling around the wound would have significantly undermined the conclusion of the ballistics expert that petitioner was far away when he discharged the firearm. Moreover, the conclusion of the firearms expert contradicted petitioner's own statements and his drawing of the crime scene and defense counsel's own observations of the crime scene. (*Id.*).

Judge Corwin also dismissed petitioner's argument of ineffectiveness assistance arising from counsel's decision not to put defendant's mental state issue through an expert witness.

The court observed that this would have opened the door to the prosecutor's calling of the state forensic examiner, who issued a report dated February 18, 2004, that defendant did not meet the statutory criteria for legal insanity. It would also have allowed the prosecutor to introduce into evidence petitioner's statements about the crime made to the forensic examiner, which are not protected by privilege. (Op., 6).

The court found that defense counsel's decision not to make an opening statement was strategic and, in any event, was not prejudicial. As defense counsel decided not to call any witnesses, but to rely on the prosecutor's lack of evidence, counsel would have had nothing to talk about during an opening statement. Defense counsel did make an "extensive closing argument" during which he focused on the mental state of the defendant, the defendant's suicide attempt and the lack of evidence of premeditation and deliberation. (Op., 7). "It is difficult to see what other argument counsel could have made considering defendant's confessions on the 911 tape and to the police officers." (*Id.*).

The court pointedly rejected the contention that counsel was ineffective in waiving preliminary examination. Petitioner's criticism revolved around the assertion that defense counsel would have been successful in having the charge of first-degree murder dismissed at the preliminary examination, for lack of evidence of deliberation and premeditation. The trial judge, relying on Michigan Supreme Court precedent, found that a prosecutor is not required to present evidence of premeditation and deliberation at the preliminary examination when the defendant is charged with open murder. (Op., 8 n.1) (citing *People v. Johnson*, 427 Mich. 98, 108 (1986)).

Finally, the court rejected appellate counsel's contentions that trial counsel was ineffective for failure to cross-examine certain witnesses, conduct meaningful *voir dire*, demand a

bill of particulars, or have petitioner take a polygraph. The court found that petitioner failed to show how the result in the case might have been impacted by more aggressive performances by counsel in any of these areas. The court specifically found that the *voir dire* of trial counsel was not deficient and that most of the witnesses were police officers whose testimony was "really not in dispute or critical to the defendant's defense." (Op., 8). Trial counsel had to maintain his credibility and not alienate the jury with meaningless cross-examination. The court found that petitioner did not demonstrate how a polygraph would have been of any assistance in his trial or trial preparation, especially because the results of the test are not admissible at trial under Michigan law. (*Id.*).

In summation, Judge Corwin found that the evidence against the petitioner was "overwhelming." (Op., 8). He rejected appellate counsel's contention that the chances of a first-degree murder conviction were remote, remarking that the evidence, viewed in a light most favorable to the prosecutor, would have supported a first-degree murder verdict. "The possibility of reaching a first-degree murder verdict was not remote under a rational view of the admissible evidence. Certainly, the evidence supporting a second-degree murder verdict was overwhelming." (*Id.*, 10). Defense counsel Hines had therefore successfully spared his client a possible first-degree murder verdict with its attendant sentence of mandatory life imprisonment without possibility of parole.

On this basis, Judge Corwin denied both the motion for new trial and the motion for appellate discovery regarding the murder weapon. (*Id.*).

### 4. Appellate Proceedings

Petitioner, represented by retained counsel Mark Satawa, appealed as of right to the Michigan Court of Appeals. The appellate brief raised four grounds for relief: (1) ineffective

assistance of counsel, arising from numerous alleged acts and omissions by trial counsel; (2) trial court error arising from the court's denial of petitioner's motion for post-trial discovery to inspect the murder weapon; (3) insufficiency of the evidence to support "intent to kill and/or lack of reasonable provocation;" and (4) Sixth Amendment error arising from judicial factfinding in sentencing. (Defendant-Appellant's Brief on Appeal dated 6/21/05, found in Michigan Court of Appeals record, docket # 11). Grounds 1, 3 and 4 were presented as federal issues; ground 2, involving the right to post-trial discovery, was presented as a "question of first impression" under Michigan law.

By unpublished, *per curiam* opinion issued December 20, 2005, the Michigan Court of Appeals analyzed and rejected each of petitioner's claims for relief. The court analyzed each of petitioner's claims of ineffective assistance of counsel under the *Stricklkand* standard. Applying *Strickland*, the court found no merit in any of petitioner's contentions of ineffective assistance of counsel:

> Defendant argues that trial counsel should have challenged the first-degree murder charge and the lack of evidence of premeditation and deliberation at a preliminary examination rather than waiving it. However, defendant was charged with open murder, and "the elements of premeditation and deliberation are not required elements for which evidence must be presented at a preliminary examination in order to bind a defendant over for trial on open murder charges." *People v Coddington*, 188 Mich App 584, 593-594; 470 NW2d 478 (1991). Therefore, defendant cannot show that waiver of the preliminary examination would have affected the outcome of the trial. *Ackerman*, *supra* at 455-456. Likewise, defendant has not advanced how the failure to demand a bill of particulars affected the outcome of the trial. Trial counsel testified at the *Ginther* hearing that he did not file for a bill of particulars in the case because he knew the particulars in the case and it was a relatively simple case. Therefore, defendant cannot show how this strategic decision affected the outcome of the case. Similarly, defendant has not shown how the failure to offer him a polygraph examination affected the trial's outcome. Defendant did not testify at trial, and evidence of polygraph results would not have been admissible anyway. *People v Barbara*, 400 Mich 352, 359; 255 NW2d 171 (1977).

Defendant next alleges that counsel was ineffective for failing to suppress defendant's statements to police. However, defendant does not offer any legal reasoning warranting the suppression of his obviously voluntary statements and has abandoned the issue on appeal. See *People v Harris*, 261 Mich App 44, 50; 680 NW2d 17 (2004). Defendant also argues that trial counsel should have moved to have the context of one of his inculpatory statements admitted into evidence under MRE 106. However, defendant does not address the merits of this issue, either, so it is also abandoned. *Harris*, *supra*. Defendant also argues that counsel was ineffective for waiving his opening statement. However, defendant did not present any proofs, so he had nothing on which to base an appropriate opening argument, and his counsel made an extensive closing argument, accurately presenting defendant's theory of the case to the jury. See *People v Buck*, 197 Mich App 404, 413-414; 496 NW2d 321 (1992), rev'd in part on other grounds sub nom *People v Holcomb*, 444 Mich 853 (1993). Therefore, his trial counsel did not err in this regard.

Defendant next argues that counsel was ineffective for failing to call witnesses, specifically a ballistics expert, a psychological expert, and defendant's daughter. However, defendant has not proffered any admissible, exculpatory evidence from the proposed experts, so he has failed to demonstrate how these experts would have assisted his defense. *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004). Additionally, trial counsel testified that he did not call defendant's daughter to testify because it would have opened the door to potentially harmful rebuttal testimony from defendant's other adoptive children. This trial strategy was reasonable and not ineffective. *Id*. Defendant finally argues that counsel was ineffective for failing to cross-examine witnesses and present any type of defense to the charges. Trial counsel established a defense based on provocation and a lack of premeditation and was successful in defending against the first-degree murder charge. In this case, this result alone strongly indicates the effectiveness of counsel. Although, in hindsight, counsel may have been able to do more, defendant has not shown any deficiencies that could have substantially changed the course of trial. *Ackerman*, *supra* at 455.

(Op., 2-3, footnote omitted).

The court rejected petitioner's request for post-trial discovery on state-law grounds.

With regard to the challenge to the sufficiency of the evidence, the court found as follows:

Defendant argues that there was insufficient evidence to support his conviction of second-degree murder. However, even if the jury believed that defendant lacked the necessary intent to kill his wife, second-degree murder is a general intent crime. *People v Goecke*, 457 Mich 442, 469; 579 NW2d 868 (1998). Here, there was sufficient evidence that, while enraged, defendant stood a few feet

-23-

away from his wife, pointed a shotgun directly at her head, and fired. It follows that defendant "acted with wanton and wilful disregard of the likelihood that the natural tendency of the defendant's conduct was to cause death or great bodily harm" *Id.* at 470. Nevertheless, defendant also argues that the jury should have found sufficient provocation to reduce the charge to manslaughter. Not only is an argument over bathroom fixtures insufficient provocation for the use of deadly force, the prosecutor provided sufficient evidence on all of the elements of second-degree murder and was not required to disprove defendant's theory of innocence. *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000).

(Op., 3). Finally, the court rejected petitioner's Sixth Amendment argument based on *Blakely v. Washington*, 542 U.S. 296 (2004). Relying on a decision of the state Supreme Court, the Court of Appeals found that *Blakely* does not affect Michigan's indeterminate sentencing system, because any factfinding by the trial judge affects only the minimum, not the maximum, sentence. (Op., 3). The appellate court therefore affirmed both the conviction and the sentence.

Petitioner, still represented by retained counsel, filed an application for leave to appeal to the Michigan Supreme Court. The application raised the same four claims that the state Court of Appeals had reviewed and rejected. By standard order entered May 30, 2006, the state Supreme Court denied leave to appeal, because it was not persuaded that the questions presented should be reviewed by the court. Justice Kelly would have held the case in abeyance pending the Supreme Court's decision in *People v. Drohan*, which involved only the sentencing issue.[5]

Petitioner instituted this timely habeas corpus action by petition filed March 21, 2007. The petition is not supported by a brief dedicated to the federal habeas corpus issues presented therein, but merely attaches petitioner's application for leave to appeal to the state Supreme Court, as well as other lower court materials.

---

[5] *People v. Drohan*, 715 N.W.2d 778 (Mich. 2006), was decided later that year. The *Drohan* court found that *Blakely* does not apply to the Michigan scheme of indeterminate sentencing, as the maximum sentence is set by law.

## Applicable Standard

Because petitioner filed his habeas application long after the April 1996 enactment of the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 ("AEDPA"), the provisions of that law govern the scope of the court's review. *See Penry v. Johnson*, 532 U.S. 782, 791 (2001); *Wilson v. Parker*, 515 F.3d 682, 691 (6th Cir. 2008). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands that state court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted); *see Wilkins v. Timmerman-Cooper*, 512 F.3d 768, 774 (6th Cir. 2008). "AEDPA requires heightened respect for state court factual and legal determinations." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006). If a state court adjudicated the claim, deferential AEDPA standards must be applied. 28 U.S.C. § 2254(d); *see Waddington v. Sarausad*, 129 S. Ct. 823, 831 (2009). *De novo* review is restricted to instances where the state court did not address the merits of a claim. In that limited set of circumstances, "there are simply no results, let alone reasoning, to which [the habeas] court can defer." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003); *Van v. Jones*, 475 F.3d 292, 293 (6th Cir. 2007); *Maples v. Stegall*, 427 F.3d 1020, 1025 (6th Cir. 2005).

The AEDPA prevents federal habeas "retrials" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). Section 2254(d) states that an application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication "(1) resulted in a decision that

was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "Section 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning. A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than the [Supreme Court] on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. at 694 (citations omitted). A federal court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from Supreme Court decisions, but unreasonably applies it to the facts of the particular case, or if the state court unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Williams v. Taylor*, 529 U.S. 362, 407 (2000); *see Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

"It is important to note, however, that 'an *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law.'" *Harbison v. Bell*, 408 F.3d 823, 829 (6th Cir. 2005) (quoting *Williams*, 529 U.S. at 409); *Waddington*, 129 S. Ct. at 831; *Fleming v. Metrish*, 556 F.3d 520, 525 (6th Cir. 2009). "The question under AEDPA is not 'whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable -- a substantially higher threshold.'" *Holder v. Palmer*, 588 F.3d 328, 337-38 (6th Cir. 2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent

judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *see Walls v. Kontech*, 490 F.3d 432, 436 (6th Cir. 2007). Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410; *see Bell v. Cone*, 535 U.S. at 694; *Keith v. Mitchell*, 455 F.3d 662, 669 (6th Cir. 2006) ("The proper inquiry under the 'unreasonable application' analysis is whether the state court decision was objectively unreasonable and not simply erroneous or incorrect."); *Payne v. Bell*, 418 F.3d 644, 653 (6th Cir. 2005) ("A state court decision involves an 'unreasonable application' of clearly established Supreme Court precedent when it correctly identifies the governing legal standard but applies it to the facts before it in an objectively unreasonable manner.") (citations omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. at 412; *Wilson v. Parker*, 515 F.3d at 691; *Ross v. Petro*, 515 F.3d 653, 660 (6th Cir. 2008), *cert. denied*, 129 S. Ct. 906 (2009). This court may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *See Williams*, 529 U.S. at 381 ("If this Court has not broken sufficient legal ground to establish an asked for constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar."); *see also Knowles v. Mirzayance*, 129 S. Ct. 1411, 1419 (2009); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).

Regardless of the subsection of 2254(d) relied on by the petitioner, AEDPA requires heightened respect for state factual findings. 28 U.S.C. § 2254(e)(1); *see Herbert v. Billy*, 160 F.3d

1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence 28 U.S.C. § 2254(e)(1); *Jaradat v. Williams*, 591 F.3d 863, 864-65 (6th Cir. 2010); *Mills v. Cason*, 572 F.3d 246, 250 (6th Cir. 2009).

## Discussion

### I.    Ineffective Assistance of Counsel

Relying on his state-court appellate briefing, petitioner asserts that his trial counsel was ineffective in numerous ways, in violation of petitioner's Sixth Amendment right to the effective assistance of counsel. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. Petitioner must prove: (1) that counsel's performance fell below an "objective standard of reasonableness;" and (2) that counsel's deficient performance prejudiced the defendant, resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance of counsel must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690. Strategic choices, made after investigation of law and the facts, are "virtually unchallengeable," especially when the strategic choice is supported by the defendant himself. *Id.* at 690-91. To prevail on the second prong, petitioner must demonstrate a "reasonable probability" that the result of the trial would have been different but for counsel's errors. *Id.* at 694.

Because the state circuit court and court of appeals directly addressed petitioner's claims of ineffective assistance of trial counsel, their decision must be afforded deference under AEDPA. To receive habeas relief, petitioner must demonstrate that the state courts' decision was contrary to, or represented an unreasonable application of, *Strickland v. Washington*. *See Bell v. Cone*, 535 U.S. 685, 698-99 (2002); *Johnson v. Bell*, 525 F.3d 466, 487 (6th Cir. 2008), *cert. denied*, 129 S. Ct. 1668 (2009). Hence, it is not enough to convince the federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. Rather, petitioner must show that the state court "applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell*, 535 U.S. at 699. This creates a "high burden" for petitioner. *See Carter v. Mitchell*, 443 F.3d 517, 525 (6th Cir. 2006). "[B]ecause the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009). Recent Supreme Court decisions describe this as "the doubly deferential judicial review that applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard." *Knowles*, 129 S. Ct. at 1420; *see Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) (*per curiam*). Furthermore, the findings of historical fact made by the state courts are presumed to be correct, in the absence of clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1).

Petitioner challenges virtually every decision made by his trial counsel. In doing so, he merely repeats the accusations leveled by his retained appellate attorney at the *Ginther* hearing and then on appeal. Many of these accusations are frivolous on their face and represent appellate counsel's commitment to an aggressive, "Rambo" theory of criminal defense. For example, appellate counsel faulted Mr. Hines for his failure to raise objections, not because the objections

were meritorious, but merely because Hines should have obstructed the flow of the prosecutor's case. (GH, 132). Perhaps that sort of tactic is successful in the venues where Mr. Satawa regularly practices. Such tactics are not successful, or even common, in the Western District of Michigan, especially in rural venues such as Wexford County. Judge Corwin aptly commented that defense counsel would have lost his credibility and alienated the jury by raising frivolous objections or engaging in meaningless cross-examination. (Op., 8). Similarly frivolous is the criticism arising from defense counsel's failure to subject his client to a polygraph examination, which obviously would be inadmissible at trial. The only support for this contention was presented by petitioner's expert witness, who advanced a rather convoluted theory that a successful polygraph might have assisted petitioner in gaining a favorable resolution by guilty plea. (GH, 147-48). This far-fetched theory of ineffective assistance of counsel was dispelled by cross-examination of petitioner's expert witness, who ultimately was forced to retreat from his opinion. (GH 148-50).[6] Similarly insubstantial is the charge that trial counsel was ineffective for failure to demand a bill of particulars. Appellate counsel advanced the theory that a bill of particulars would have forced the prosecutor to disclose the evidence supporting deliberation and premeditation, thus making the first-degree murder charge vulnerable to attack by a pretrial motion. The evidence supporting the first-degree murder charge -- petitioner's 911 statements, his *Mirandized* confession, and the forensic evidence -- was all produced to defense counsel, who testified that he was perfectly aware of the basis for the first-degree murder charge. Furthermore, as both the trial court and the Court of Appeals pointed out,

---

[6] Petitioner's expert essentially opined that defense counsel should have pursued a polygraph because there was "no downside." (GH, 148). The Supreme Court has recently, and pointedly, rejected the contention that the *Strickland* standard is satisfied by argument that defense counsel should have pursued an issue where there was "nothing to lose." *Knowles*, 129 S. Ct. at 1419.

state law does not require a pretrial showing of deliberation and premeditation to support an open murder charge, as the specification of the degree of murder is not required at this stage of the proceedings. *See People v. Johnson*, 398 N.W.2d 219, 222-23 (Mich. 1986); *People v. Coddington*, 470 N.W.2d 478, 484 (Mich. Ct. App. 1991). Such captious claims of attorney error far fall short of satisfying the first prong of the *Strickland* standard.

Petitioner's remaining claims of ineffective assistance of counsel are not much more substantial. A brief examination of these claims will suffice to show that the decisions of the state trial court and Court of Appeals did not represent an unreasonable application of *Strickland*.

A.    Failure to Demand Preliminary Examination

Petitioner faults his counsel for advising him to waive the preliminary examination. The waiver was part of an agreement with the prosecutor, pursuant to which the prosecutor would amend the criminal information to expressly add a charge of voluntary manslaughter. (GH, 101). At the *Ginther* hearing, Mr. Hines testified that this amendment gave his client a tactical advantage at trial. Petitioner nevertheless claims that the waiver represented ineffective assistance of counsel. This theory of ineffectiveness is based on two assertions, both of them erroneous. First, petitioner argues that the waiver deprived him of his only pretrial opportunity for dismissal of the first-degree murder charge. Petitioner argues that the evidence of premeditation and deliberation, essential to a finding of first-degree murder, was "nonexistent" and that the examining magistrate would have refused to bind petitioner over on this charge. Petitioner's argument ignores Michigan law, which holds that "the elements of premeditation and deliberation are not required elements for which evidence must be presented at a preliminary examination in order to bind a defendant over for trial

on open murder charges." *People v. Coddington*, 470 N.W.2d at 484. Consequently, petitioner's assertion that waiver of the preliminary examination deprived him of the chance for dismissal of the first-degree murder charge is unsupportable.

Petitioner's second theory of ineffectiveness in this regard is that Mr. Hines misunderstood Michigan law in believing that amendment of the Information gave him a tactical advantage at trial by assuring that the case would go to the jury on the lesser-included offense of manslaughter. At the *Ginther* hearing, Mr. Hines repeatedly testified that he considered the evidence of provocation weak and therefore feared that the examining magistrate would not bind over on a manslaughter charge, but on open murder only. (GH, 107). He based this decision on his reading of *People v. Cornell*, a Michigan Supreme Court decision. On appeal, appellate counsel argued that this was a blunder, because the holding in *People v. Cornell* had been superseded by *People v. Mendoza*, 664 N.W.2d 685 (Mich. 2003). It was appellate counsel, and not Mr. Hines, who misunderstood Michigan law. *People v. Mendoza* did not alter or modify the holding in *Cornell* in any way material to the present case.[7] Under both *Cornell* and *Mendoza*, a defendant charged with murder is entitled to a manslaughter instruction if, but only if, a manslaughter instruction is supported by a rational review of the evidence. *See Mendoza*, 664 N.W.2d at 693; *Cornell*, 646 N.W.2d at 139-40. This is precisely why Mr. Hines was concerned about the effect of *Cornell* in this case. He was worried that the trial judge would refuse to charge the jury on the lesser-included offense of voluntary manslaughter, because the evidence of provocation was legally insufficient and

---

[7] *Mendoza* overruled *Cornell* only to the extent that *Cornell* and other cases had differentiated between "necessarily included lesser offenses" and "cognate lesser offenses." 664 N.W.2d at 694. That distinction played no part in this case.

therefore an instruction on manslaughter would not be supported by a rational view of the evidence.[8] (GH, 106-07). Nothing in the *Mendoza* case undermines this fear on the part of defense counsel. To avoid this result, Mr. Hines obtained from the prosecutor an agreement to amend the Information expressly to include manslaughter, thus assuring that the jury would be instructed on this charge. As a result of the amendment, manslaughter was no longer in the case as a lesser-included offense to the open murder charge but was a separately charged offense, for which petitioner would clearly be entitled to an instruction. Far from representing ineffective assistance, the decision of Mr. Hines to strike this bargain with the prosecutor probably gained petitioner an advantage to which he was not otherwise entitled.

B.    Failure to Investigate "Accident" Defense and to Hire Ballistics Expert

Petitioner raises two related claims of ineffective assistance of counsel. He asserts that Mr. Hines should have investigated the possibility that the shooting was accidental and should have hired a ballistics expert to examine the .410 gauge shotgun in support of this defense. The prosecutor had the shotgun examined by Detective Sgt. Hickman of the Michigan State Police Forensic Laboratory, who provided a report concluding that (1) the firearm functioned as designed; (2) the trigger pull of approximately 5-1/4 pounds is "within normal parameters;" and (3) the shotgun will not fire by maintaining trigger pressure and activating the slide. (Report of 2/20/04, attached to Petition). Mr. Hines testified that he was given a copy of the report and that it satisfied him that the shotgun did not have a "hair trigger," thus making accidental discharge unlikely. (GH, 86). Hines testified that he pursued the defense of accident with his client, who never claimed that the

---

[8] This fear was well-founded. As shown in section III below, the evidence of provocation in this case was clearly deficient, as a matter of law.

gun discharged accidentally. (*Id.*, 87). Furthermore, Hines believed that his client's statements to the 911 operator negated the defense of accident. (*Id.*). Hines discussed the matter "many times" with petitioner. They decided not to procure their own ballistics expert. (GH, 48-49). He was comfortable with the pathologist's opinion that the muzzle was relatively close to the victim -- 18-to-30 inches away. (GH, 81-83). At the *Ginther* hearing, appellate counsel presented the testimony of a firearms expert, Stephen Howard. Howard could not opine whether the shotgun had some defect that might allow it to discharge accidentally, because Howard never had access to the firearm.

Judge Corwin's written opinion expressly dealt with this claim of ineffectiveness, arising from the alleged failure to investigate a defense of accident and to present expert testimony on the issue. He found that counsel was not ineffective for failing to pursue a defense of accident, because petitioner never told his counsel that the gun discharged accidentally, and the sequence of events related by petitioner did not support a finding of accident. Trial counsel was not required to "fabricate defenses" that were unsupported by the facts. (Op., 5). Having heard petitioner's ballistics expert testify, Judge Corwin found that the testimony would have undermined any defense of accident, because the ballistics expert concluded that the gun was much farther away from the victim than the pathologist had estimated. Thus, presentation of Howard's testimony would have supported the prosecutor's theory of first-degree murder, because "it is highly unlikely that an accidentally discharged shotgun from several feet away would have hit the victim directly between her ear and her eye on a straight line." (Op., 6). The Michigan Court of Appeals reviewed the issue in more summary fashion, finding that the evidence proffered at the *Ginther* hearing was not exculpatory and that petitioner had failed to demonstrate how calling an expert witness would have assisted in his defense. (Op., 2).

The question for this court is whether the decisions of the state trial court and Court of Appeals represent an unreasonable application of *Strickland*. Certainly, an attorney's failure to investigate can abridge the right to effective assistance of counsel. *See Dando v. Yukins*, 461 F.3d 791, 801-02 (6th Cir. 2006). But the facts developed in the trial court show that counsel indeed investigated an accident theory. He concluded that the defense of accident was not supported by petitioner's own statement or the physical evidence at the crime scene. Furthermore, the firearm had been examined by the State Police forensics lab, which found no defect. Defense counsel's investigation of this issue was more than objectively reasonable, especially in light of the trial court's factual finding, unrebutted in this record, that petitioner never told his attorney that the shooting was an accident.

Likewise, a trial attorney may substantially prejudice his client's chance for acquittal by failure to call an expert witness on a disputed issue. In the present case, however, the defense of accident was never in the case. Judge Corwin was certainly accurate in remarking that the Sixth Amendment does not require an attorney to fabricate a defense when the facts do not support it. Moreover, Judge Corwin found, and the Court of Appeals concurred, that the ballistics expert called by petitioner's appellate counsel would have helped the prosecution, not petitioner. Mr. Hines was comfortable with the coroner's finding that placed petitioner rather close to the victim at the time of the gunshot. As Judge Corwin noted, the testimony of the ballistics expert, who placed petitioner much further away from the victim, would not support a jury finding that petitioner "accidentally" placed a perfect shot between his wife's eye and temple from across the room. Such testimony would have directly supported a finding of intent to kill, sufficient to support first-degree murder. In these circumstances, the state courts were more than reasonable in finding calling a ballistics

expert would not have assisted petitioner and very well may have assisted the prosecutor.[9]  The

decision not to call an expert whose testimony could well inculpate the defendant is sound trial

strategy and does not constitute ineffective assistance.  *See Samatar v. Clarridge*, 225 F. App'x 366,

372 (6th Cir. 2007).

C.      Failure to Move For Suppression of Statements

Petitioner faults his trial counsel for failing to seek suppression of petitioner's

statements to the 911 dispatcher and his later confession.  Petitioner has not cited in this court, nor

did he cite in the Michigan appellate courts, any authority supporting suppression of his pretrial

statements.  Petitioner was not in custody during the 911 conversation, and therefore could not rely

upon the lack of *Miranda* warnings.  *See Illinois v. Perkins*, 496 U.S. 292, 297-98 (1990) (*Miranda*

applies only when suspect is interrogated while in custody).  Petitioner's confessions, given at the

sheriff's office, were not subject to attack under *Miranda*, because petitioner was clearly *Mirandized*

before each interrogation.  The record does not show, and petitioner does not suggest, any official

coercion by the interrogating officers, a necessary element to a finding that a pretrial statement was

given involuntarily.  *See Colorado v. Connelly*, 479 U.S. 157, 170 (1986).  In the absence of official

coercion, the fact that petitioner's mental state may have been agitated or even suicidal is insufficient

to undermine the voluntariness of the confession.  *Id.* at 167; *accord United States v. Murphy*, 107

F.3d 1199, 1205-06 (6th Cir. 1997) (confession voluntary because of lack of evidence of police

---

[9] This is not a situation in which the murder weapon had not been examined by any expert, and therefore very well may have been defective.  Mr. Hines acted reasonably in relying on the forensic examination of the Michigan State Police laboratory, a respected source.  The Supreme Court has never held that a defense attorney is ineffective for failure to have duplicative forensic tests performed on evidence where there is no indication that the state's examination was flawed.

coercion, even though defendant was of limited mental capacity). The Michigan Court of Appeals rejected this claim of ineffective assistance of counsel, noting that petitioner did not offer any legal reasoning warranting the suppression of his "obviously voluntary statements." (Op., 2). This holding is easily sustainable under the AEDPA standard. An attorney is not ineffective for failure to raise meritless or insubstantial defenses. *See Mahdi v. Bagley*, 522 F.3d 631, 638 (6th Cir. 2008); *accord Evans v. Hudson*, 575 F.3d 560, 566 (6th Cir. 2009) (petitioner cannot suffer prejudice from counsel's failure to raise a meritless claim).

### D.     Failure to Call Witnesses or Make An Opening Statement

Petitioner's final claims of ineffectiveness are intertwined. He faults counsel for failing to call witnesses and failing to make an opening statement. Neither claim of ineffectiveness withstands scrutiny.

In the state trial and appellate courts, petitioner argued that his counsel should have called witnesses, but only presented an offer of proof concerning two potential witnesses. The first was the ballistics expert, Mr. Howard, whose testimony, as shown above, would likely have helped the prosecution prove first-degree murder. The only other potential witness was Jennifer Herndon, the daughter of petitioner and the victim. The offer of proof showed that Ms. Herndon would have testified that over the previous few years, petitioner "began to lose it a little," slowing down and becoming forgetful. She also would have testified that her mother was having a lot of difficulty with this fact and that her mother was a "hard woman" who was tough on petitioner. Obviously, this general testimony would have been of little help to petitioner. At the *Ginther* hearing, Mr. Hines testified that he and petitioner did discuss calling Jennifer as a witness but decided not to because

"it would have invited rebuttal testimony from Amy and Kelly [petitioner's stepdaughters] who were adamantly opposed to Ed." (GH, 60). Hines testified that *petitioner* had a "real concern" that Amy and Kelly not testify at trial. (*Id.*). This is a paradigmatic tactical decision made in consultation with a defendant, which *Strickland* teaches is "virtually unchallengeable." 466 U.S. at 690-91.

The challenge to trial counsel's strategic decision concerning an opening statement is similarly meritless. Michigan law expressly allows defense counsel to postpone the opening statement until after the prosecution rests. Mich. Ct. R. 6.414(C). Postponing the opening statement is a common tactic among defense counsel in Michigan, especially where, as here, the defense is that the prosecution has not met its burden of proving each element of the offense beyond a reasonable doubt. Defense counsel will often postpone the opening statement for fear of conceding an element of the prosecutor's burden of proof. Petitioner's appellate counsel cited law review articles and practice guides that take the contrary position, arguing that the rule of primacy demands that defense counsel get the defendant's story before the jury at the outset of the case. This matter is not free from doubt, and very experienced defense counsel often opt to postpone the opening statement. A tactical decision about which competent lawyers might disagree does not qualify as objectively unreasonable conduct. *See Bell v. Cone*, 535 U.S. 685, 702 (2002).

Mr. Hines opted to defer his opening statement until the close of the prosecution's proofs, as allowed by state law. He then presented his motion for a directed verdict, which the trial judge denied. Having decided, in consultation with his client, not to present any witnesses, defense counsel had nothing to talk about in an opening statement. "The purpose of an opening statement is to tell the jury what the advocate proposes to show." *People v. Moss*, 245 N.W.2d 389, 396 (Mich. Ct. App. 1976). The trial court would not have allowed Mr. Hines to argue his case under

the guise of presenting an opening statement. Rather, the case then proceeded immediately to final arguments. The trial court found that defense counsel did make an "extensive closing argument" during which he focused on all relevant issues, including petitioner's mental state, his suicide attempt, and the lack of evidence of premeditation and deliberation. "It is difficult to see what other argument counsel could have made considering defendant's confessions on the 911 tape and to the police officers." (Op., 7). The state Court of Appeals likewise rejected a claim of ineffectiveness on this score, remarking that "defendant did not present any proofs, so he had nothing on which to base an appropriate opening argument, and his counsel made an extensive closing argument, accurately representing defendant's theory of the case to the jury." (Op., 2).

The issue for this court is whether these holdings of the state courts represent an unreasonable application of *Strickland*. The holdings of the state courts are completely in line with the Sixth Circuit's understanding of the requirements of *Strickland* with regard to opening statements. The Court of Appeals has held that a trial counsel's failure to make an opening statement does not automatically establish ineffective assistance. *See Moss v. Hofbauer*, 286 F.3d 851, 863 (6th Cir. 2002). *Moss* involved an identical situation, in which counsel deferred her opening statement and then decided to rest without making an opening statement or calling witnesses. The Court of Appeals remarked that trial counsel's decision not to make an opening statement is a matter of professional judgment and can often be the wiser course to follow. *Id.* (citing *Williams v. Beto*, 354 F.2d 698, 703 (5th Cir. 1965)). The *Moss* court further remarked that an opening statement is unnecessary when defendant does not plan to offer any evidence and that an opening statement positively should not be made if counsel does not expect to introduce evidence tending to substantiate it. *Id.* Furthermore, even if waiving an opening statement is not considered

sound tactics, it is unlikely that waiver will create a reasonable possibility of a different outcome in the case.  *Id.* at 864.

In summary, it is impossible to conclude that the decisions of the state trial court and Court of Appeals rejecting petitioner's Sixth Amendment claim represent an unreasonable application of the *Strickland* standard.  Petitioner has the burden of overcoming a strong presumption in favor of competent performance *and* of showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  In other words, petitioner must make a showing that the result of this case was "rendered unreliable by a breakdown in the adversary process caused by deficiencies in counsel's assistance."  *Id.* at 700.  In the present case, counsel was successful in establishing a defense based on petitioner's mental state, thereby sparing petitioner a first-degree murder conviction and the attendant mandatory life sentence.  Petitioner's first claim for relief, based on violations of his Sixth Amendment right to effective assistance of counsel, must be rejected.

## II.     Motion for Post-Trial Discovery

Petitioner's second claim for habeas relief, again repeated verbatim from his state appellate briefs, asserts that his right to due process of law was abridged by the trial court's denial of petitioner's motion for post-trial access to the murder weapon.  This claim was presented in the state appellate courts as a matter of first impression under Michigan law.  In presenting this claim to the state appellate courts, petitioner cited no decision of the United States Supreme Court establishing a right to post-judgment discovery.

The federal courts may issue a writ of habeas corpus to release a state prisoner only on the ground that he is in custody in violation of the federal Constitution or laws. 28 U.S.C. § 2254(a). A habeas court cannot release a state prisoner on the ground that the conviction or sentence violates state law. *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991). Furthermore, as a consequence of the passage of AEDPA, the federal principle relied on by a petitioner must be "clearly established" by the holdings, and not the *dicta*, of the Supreme Court of the United States. 28 U.S.C. § 2254(d); *see Williams v. Taylor*, 529 U.S. 362, 381 (2000). In the present case, petitioner invokes no clearly established federal constitutional right to post-trial discovery. Petitioner's counsel was given a forensic examination report of the murder weapon and offered an opportunity for examination, but decided not to avail himself of this pretrial opportunity. The first request for access to the murder weapon came after trial. The Supreme Court of the United States has never held that the Constitution guarantees a right of post-trial discovery to a state criminal defendant. Indeed, to the extent that the Court has opined in this area, its decisions point in the opposite direction. *See District Attorney's Office v. Osborne*, 129 S. Ct. 2308 (2009) (no due process right to post-conviction DNA testing).

Petitioner's second claim for relief is a pure state-law claim, not cognizable in a federal habeas corpus case.

## III.    Insufficiency of the Evidence

Petitioner's third claim for relief is that the evidence was insufficient to support the jury's verdict on the second-degree murder charge because the prosecution failed to present sufficient evidence of an intent to kill and a lack of reasonable provocation. The state Court of

Appeals rejected this claim, pointing out that proof of intent to kill is not necessary to sustain a second-degree murder conviction under Michigan law. The court further found that the argument between petitioner and his wife provided insufficient provocation for the use of deadly force. The appellate court found that the prosecutor provided sufficient evidence on all of the necessary elements of second-degree murder. (Op., 3).

The Due Process Clause of the Fourteenth Amendment requires that the prosecution prove "all elements of the offense charged, and must persuade the fact finder 'beyond a reasonable doubt' of the facts necessary to establish each of those elements." *Sullivan v. Louisiana*, 508 U.S. 275, 277-78 (1993) (citations omitted). When challenging the sufficiency of the evidence under due process principles, a habeas petitioner is entitled to relief only "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). The court must give deference to the fact-finder's determination based on "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* at 319. In evaluating the evidence presented at trial, this court must "view all evidence and resolve all reasonable inferences in favor of the government." *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007).

The Michigan Court of Appeals ruled directly on this claim, which petitioner's retained counsel raised on appeal. Review of this issue must therefore be conducted under the AEDPA standard, which the Sixth Circuit describes as "very deferential." *Durr v. Mitchell*, 487 F.3d 423, 448 (6th Cir. 2007). Review of challenges to the sufficiency of the evidence under the *Jackson v. Virginia* standard proceeds under the "unreasonable application" prong of AEDPA. *See Saxton*

*v. Sheets*, 547 F.3d 597, 602 (6th Cir. 2008); *Thompson v. Bock*, 215 F. App'x 431, 435 (6th Cir. 2007). In other words, such an argument is properly understood as an allegation that the state court's decision resulted in an unreasonable application of *Jackson v. Virginia*. *See Eady v. Morgan*, 515 F.3d 587, 596 (6th Cir. 2008). Review in such cases "is limited to determining whether the evidence was so overwhelmingly in favor of the petitioner that it compelled a verdict in his or her favor." *Thompson*, 215 F. App'x at 436. This standard presents a "very difficult hurdle" for the habeas petitioner. *Id.*

The Sixth Circuit recently summarized the "double layer of deference" given the state-court decisions in this context:

> Thus, after AEDPA, federal courts reviewing state habeas claims accord a double layer of deference:
> First, as in all sufficiency-of-the-evidence challenges, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, *any rational trier of fact* could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In doing so, we do not re-weigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury. *See United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993). Thus, even though we might have not voted to convict a defendant had we participated in jury deliberations, we must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution. Second, even were we to conclude that a rational trier of fact could *not* have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable. *See* 28 U.S.C. § 2254(d)(2).

*White v. Steele*, No. 08-5498, ___ F.3d ___, 2009 WL 4893144, at * 2 (6th Cir. Dec. 21, 2009) (quoting *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

In reviewing the sufficiency of the evidence to support a jury's verdict, this court must do so with explicit reference to the substantive elements of the criminal offense as defined by state

law. *Jackson*, 443 U.S. at 324 n.16; *accord Parker v. Renico*, 506 F.3d 444, 448 (6th Cir. 2007).

"Common law murder encompasses all killings done with malice aforethought and without

justification or excuse." *People v. Mendoza*, 664 N.W.2d 685, 689 (Mich. 2003). First-degree

murder is a statutory offense, comprehending both deliberate and premeditated killings and murders

committed during the course of committing another felony. MICH. COMP. LAWS § 750.316. Second-

degree murder, by contrast, is a common-law offense. *See People v. Goecke*, 579 N.W.2d 868, 878

(Mich. 1998). The elements of second-degree murder are (1) death, (2) caused by an act of the

defendant, (3) with malice, and (4) without justification or excuse. *Id.* The *mens rea* element of

second-degree murder is satisfied by proof beyond a reasonable doubt of one of three mental states:

the intent to kill, the intent to do great bodily harm, or the wanton and wilful disregard of the

likelihood of the natural tendency of the defendant's behavior to cause death or great bodily harm.

*People v. Aaron*, 299 N.W.2d 304, 326 (Mich. 1980); *accord Goecke*, 579 N.W.2d at 878. The third

form of malice is referred to as "depraved heart murder." *Goecke*, 579 N.W.2d at 878.

Petitioner argues in this court, as he argued in the state Court of Appeals, that the

evidence presented to the jury was insufficient to establish intent to kill. As the state Court of

Appeals correctly pointed out, this argument is beside the point, because specific intent to kill is only

one of the alternative mental states required. "[T]he *mens rea* for second-degree murder does not

mandate a finding of specific intent to harm or kill. The intent to do an act in obvious disregard of

life-endangering consequences is a malicious intent." *Goecke*, 579 N.W.2d at 879 (citation omitted)

Last week, the Sixth Circuit Court of Appeals reaffirmed this basic doctrine of criminal law: "[W]e

emphasize that Michigan's definition of malice does not require that a defendant act with the intent

to commit murder. Rather, the standard is much broader and includes the intent to do serious bodily

injury or the intent to do an act in wanton and wilful disregard of the likelihood that the natural consequence of such behavior is to cause death *or* great bodily harm." *Stewart v. Wolfenbarger*, ___ F.3d ___, No. 08-2154, slip op. at 14 (6th Cir. Feb. 19, 2010). The state Court of Appeals found that the evidence was sufficient to show that petitioner, while enraged, stood a few feet away from his wife, pointed a shotgun directly at her head, and fired. This evidence was sufficient to establish wantonness, one of the allowable mental states for second-degree murder. (Op., 3). This conclusion is unassailable. The proofs supported a jury finding that the shooting was neither justified nor unintentional, but an act brought on by petitioner's loss of temper. He admitted to police that he "really didn't plan to kill her . . . . I guess my temper just got with me and I just blew." Petitioner told the 911 operator during his second call that "I just lost my temper . . . I've got a hell of a temper. I let it kill me this time, and then I let it kill her." These admissions by petitioner, viewed in a light most favorable to the prosecution, are clearly sufficient to show wantonness, or depraved heart murder, under Michigan law.

Petitioner's second argument in this regard is that the evidence was insufficient to show a lack of reasonable provocation. On this basis, petitioner contends that the prosecution, at best, proved only voluntary manslaughter. Voluntary manslaughter shares all the elements of murder, except the element of malice. *See People v. Parney*, 296 N.W.2d 568, 575 (Mich. Ct. App. 1979). Under Michigan law, the difference between second-degree murder and manslaughter is that a manslaughter conviction requires that the defendant show, by a preponderance of the evidence, that he killed "in the heat of passion," with such passion caused by "adequate provocation." *See Ruelas v. Wolfenbarger*, 580 F.3d 403, 410 (6th Cir. 2009) (citing *Mendoza*, 664 N.W.2d at 690). To qualify as provocation adequate to reduce second-degree murder to manslaughter, the provocation

must be sufficient to cause a reasonable person to lose control. *People v. Pouncey*, 471 N.W.2d 346, 350 (Mich. 1991). "Not every hot-tempered individual who flies into a rage at the slightest insult can claim manslaughter. The law cannot countenance the loss of self-control; rather, it must encourage people to control their passions." *Id.* Michigan law holds that insulting words are generally not adequate provocation. *Id.* at 351. Despite the facial insufficiency of the evidence of provocation in the present case, the trial court submitted the issue to the jury under proper instructions, because the prosecutor had specifically charged voluntary manslaughter in the criminal Information. Defense counsel argued that the crime was, at most, manslaughter, but the jury obviously rejected this contention.

On direct review, the state Court of Appeals found that an argument over bathroom fixtures is insufficient provocation for the use of deadly force. (Op., 3). The jury was nevertheless able, under the instructions given by the trial court, to render a verdict of voluntary manslaughter had it so desired. On this record, there is no basis for overturning the jury's verdict for the insufficiency of the evidence, as the evidence was clearly sufficient to support a second-degree murder conviction, and the evidence of adequate provocation to reduce the charge to manslaughter was exceedingly thin.

The decision of the state Court of Appeals upholding the sufficiency of the evidence to support a second-degree murder conviction was not an unreasonable application of the *Jackson v. Virginia* standard. Petitioner's third claim for relief must therefore be rejected.

## IV.    Sentencing Error

Petitioner's final claim is that the trial court abridged petitioner's rights under the Sixth Amendment by making factual findings relevant to sentencing that should have been made by

-46-

a jury. Petitioner invokes the Supreme Court's decision in *Blakely v. Washington*, 542 U.S. 296 (2004).

Petitioner's Sixth Amendment challenge under *Blakely* is meritless. In *Blakely*, the Supreme Court found that the Washington State determinate sentencing scheme, pursuant to which a defendant's maximum sentence could be enhanced by judicial fact-finding, violated the Sixth Amendment right to trial by jury. The *Blakely* Court was careful to note, however, that indeterminate sentencing schemes do not afoul of this principle. 542 U.S. at 308-09. Michigan has just such an indeterminate sentencing scheme. The maximum sentence is not determined by the trial judge but is set by law. *See People v. Drohan*, 715 N.W.2d 778, 789-90 (Mich. 2006). The sentencing judge chooses only a minimum sentence, within the range suggested by the state sentencing guidelines. *Id.* at 790. Under Michigan law, the trial judge sets the minimum sentence, but can never exceed the maximum sentence. *Id.* The Sixth Circuit has now authoritatively held that a Michigan trial judge's fact-finding to set a minimum sentence does not violate a defendant's Sixth Amendment rights under *Blakely*. *See Chontos v. Berghuis*, 585 F.3d 1000 (6th Cir. 2009).

The Supreme Court's Sixth Amendment jurisprudence with regard to sentencing has no application to the Michigan system of indeterminate sentencing. Petitioner's last claim for habeas corpus relief must therefore be rejected.

## Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be denied on its merits.

Dated:   February 22, 2010                    /s/  Joseph G. Scoville
                                               United States Magistrate Judge

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b). Failure to file timely and specific objections may constitute a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 129 S. Ct. 752 (2008); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). General objections do not suffice. *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *see Frontier*, 454 F.3d at 596-97; *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006).